**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Rachel Sasse, | No. CV-23-02029-PHX-ROS |
| Plaintiff, | **ORDER** |
| v. | |
| Progressive Advanced Insurance Company | |
| Defendant. | |

Defendant Progressive Advanced Insurance Company's Motion for Summary Judgment is before the Court. (Doc. 66). Plaintiff Rachel Sasse alleges bad faith in Progressive's handling of her underinsured motorist claim. Defendant moved for summary judgment, arguing that no evidence in the record supports a finding of bad faith and contending the Court should find its conduct in handling Plaintiff's claim adequate as a matter of law. (Doc. 75 at 7). For the reasons set forth below, the Motion will be denied.

**I.     Background[1]**

    **a.  Initial Claim**

On October 7, 2021, Plaintiff was injured in a motor vehicle accident. (Doc. 1-3 at 2). Plaintiff suffered injuries including a mild traumatic brain injury. (*Id.*). The insurance provider of the at-fault driver, State Farm, paid Plaintiff the limit of the at-fault driver's coverage, $100,000.00. (*Id.*). On April 14, 2022, Plaintiff submitted a claim to Defendant Progressive Advanced Insurance Company under her own underinsured motorist policy

---

[1] Unless otherwise noted, the facts as set forth here are undisputed or not subject to reasonable dispute based on the parties' proffered evidence.

("UIM Policy"), requesting the policy limit of $100,000. (*Id.*). In her demand, Plaintiff submitted information on her injuries and diagnoses, medical bills totaling $44,041.00, (Doc. 67-1 at 48-50), and a report (Doc. 67-1 at 29-33) from neurologist Dr. Allan Block reviewing her injuries and treatment. (Doc. 67 at ¶ 7).

Defendant's adjuster Rachel Grambo reviewed Plaintiff's claim and determined Plaintiff "ha[d] been fully compensated for her injuries." (Doc. 67-1 at 52). Ms. Grambo denied the claim on April 21, 2022, stating ". (Doc. 67-1 at 52). On April 26, 2022, Ms. Grambo's supervisor, Brian Sowards-Sulcer, reviewed the file, and indicated that there was no "indication of permanency" or "cognitive impairment rating." (Doc. 67-2 at 222). He noted that Plaintiff's records indicated she was "doing well overall," "well-adjusted to medication," taking several medications, and working with therapists, including cognitive therapists, and the BNI Concussion Institute, and she "ha[d] slowed down with her work." (Doc. 67-2 at 220). On May 18, 2022, Plaintiff demanded arbitration of the dispute. (Doc. 67 at ¶ 9).

### b. Discovery and Settlement Offers

Plaintiff submitted her initial disclosure statement on September 23, 2023 (Doc. 67-1 at 61-66). Plaintiff then underwent an Examination under Oath on September 30, 2022, during which she testified to "a lot of things that [Defendant] didn't previously know about and to things that weren't documented in her medical record" and "her ongoing complaints." (Doc.67-1 at 72). Defendant determined that an independent medical evaluation ("IME") was necessary "to assess [Plaintiff's] ongoing complaints" should she reject their $2,500 settlement offer. (Docs. 67 at ¶ 30; 67-1 at 75). Plaintiff rejected the offer, and the IME was scheduled for and conducted on January 24, 2023. (Doc. 67 at ¶ 14, 16). Plaintiff submitted a third Supplemental Disclosure Statement on February 9, 2023, identifying Lora White, an expert witness for life care plans, and providing her report valuing the cost of Plaintiff's future care at $280,784. (Doc. 67-1 at 92, 95-99). On February 17, 2023, Progressive made Plaintiff a settlement offer of $20,000. (Doc. 67 at ¶ 10). On February 20, 2023, Dr. Block submitted a supplemental report reviewing Plaintiff's

treatment history and ongoing symptoms, noting continued struggles with headaches, cognitive and personality changes, and pain, and opining on her future prognosis and continuing medical care needs. (Doc. 67-1 at 81-90).

### c. Arbitration

On March 29, 2023, the parties appeared before an arbitration panel of three: one arbitrator chosen by Plaintiff's attorney, one chosen by Defendant's attorney, and one agreed upon by the other two. (Doc. 1-3 at 4). A majority of the arbitration panel[2] found Plaintiff's total damages from the accident to be $350,000.00. Doc. (67-1 at 116). Pursuant to the award, Defendant paid Plaintiff the $100,000.00 limit of her UIM Policy coverage on April 6, 2023. (Doc. 67 at ¶ 20).

## II. Legal Standards

### a. Summary Judgment

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the nonmoving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record that it believes demonstrates the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. The non-moving party must then point to specific facts establishing there is a genuine issue of material fact for trial. Id.

At summary judgment, the Court considers only admissible evidence. See Fed. R. Civ. P. 56(c)(1)(B). When considering a motion for summary judgment, a court should not weigh the evidence or assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). A genuine issue of material fact exists "if the [admissible] evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248. In ruling on the motion for summary judgment, the Court will

---

[2] Defendants' chosen arbitrator dissented.

construe the evidence in the light most favorable to the non-moving party. *Barlow v. Ground*, 943 F.2d 1132, 1135 (9th Cir. 1991).

### b. Bad Faith

Because "an insurance contract is not an ordinary commercial bargain," but "implicit in the contract and the relationship is the insurer's obligation to play fairly with its insured," an insurer owes its insured a duty of "equal consideration, fairness and honesty." *Zilisch v. State Farm Mutual Auto. Ins. Co.*, 995 P.2d 276, 279 (Ariz. 2000) (quoting *Rawlings v. Apodaca*, 726 P.2d 565, 570-71). Thus,

> The tort of bad faith arises when the insurer 'intentionally denies, fails to process or pay a claim without a reasonable basis. Coming up with an amount that is within the range of possibility is not an absolute defense to a bad faith case. This is so because an insurer has an obligation to immediately conduct an adequate investigation, act reasonably in evaluating the claim, and act promptly in paying a legitimate claim. It should do nothing that jeopardizes the insured's security under the policy. It should not force an insured to go through needless adversarial hoops to achieve its rights under the policy. It cannot lowball claims or delay claims hoping that the insured will settle for less.

*Young v. Allstate Ins. Co.*, 296 F. Supp. 2d 1111, 1116 (D. Ariz. 2003) (emphasis added) (citation modified). "Equal consideration of the insured requires more than that." *Zilisch*, 995 P.2d at 280. Stated otherwise, "the insurer breaches the implied duty of good faith and fair dealing if it (1) acts unreasonably toward its insured, and (2) acts knowingly or with reckless disregard as to the reasonableness of its actions." *Clearwater v. State Farm Mut. Auto. Ins. Co.*, 792 P.2d 719. "An incomplete pre-denial investigation of an insured's claim can expose the insurance company to liability for bad faith . . ." but "an insurance company's failure to adequately investigate only becomes material when a further investigation would have disclosed relevant facts." *Aetna Cas. And Sur. Co. v. Superior Ct. in and for Cty. Of Maricopa*, 778 P.2d 1333

### III. Discussion

Plaintiff alleges Defendant "put [its] own interests ahead of [Sasse's] by forcing [her] to go through needless adversarial hoops, before being forced to pay [her] the benefits of [her] UIM Policy" (Doc. 1-3 at 4). Defendant contends no evidence in the record

supports a finding of bad faith and argues the Court should find its conduct in handling Plaintiff's claim adequate as a matter of law. (Doc. 75 at 7).

When Plaintiff first filed her claim, including medical bills and Dr. Block's report, Defendant reviewed the submitted materials and denied the claim with no additional investigation. Defendant argues based on Plaintiff's medical bills, Dr. Block's report, and the last recorded date of treatment, several months prior to filing the claim,[3] it had a reasonable basis for its valuation of Plaintiff's injuries as a matter of law and cannot be found to have acted in bad faith. The fact that a majority of the arbitration panel disagreed, Defendant argues, does not mean Defendant acted in bad faith. While Defendant is correct that merely being found wrong in its valuation of the claim does not by itself indicate bad faith, (Doc. 66 at 10), the magnitude of the damages awarded by the arbitration panel is such that it provokes a reasonable inference that Defendant should have investigated the claim more thoroughly at the beginning or did not act in good faith in valuing the claim.

Defendant relies on Dr. Block's statement that "Fortunately, she appears to have had a good recovery" to support the contention there was a reasonable basis for its valuation. However, there is sufficient evidence to render the question whether this provided a reasonable basis for denying Plaintiff's claim a genuine issue of material fact. Construing the facts in the light most favorable to Plaintiff, the phrase "a good recovery" does not necessarily indicate a full recovery or a lack of continuing medical problems. Dr. Block's report also details extensive treatment history, symptoms, and medication, and notes the results of a brain MRI "consistent with old posttraumatic parenchymal microhemorrhages/old hemorrhagic shearing-injury to the brain." (Doc. 67-1 at 32). Dr. Block confirmed Plaintiff's diagnoses of mild traumatic brain injury and musculoskeletal neck strain and opined "her symptoms are consistent with the injuries she suffered in the accident . . ." and "all of the treatment . . . was reasonable and necessary, and causally related to the car accident . . ." (*Id.* at 32-33). Additionally, Defendant's letter denying the claim explained the decision only by stating "we understand that Rachel Sasse incurred

---

[3] The most recent date of treatment noted in Dr. Block's report was September 14, 2021. Plaintiff has since received further treatment.

$44,041.00 in medical specials for her injuries" and "it is our understanding the tortfeasor's carrier, State Farm, has presented an offer for their liability limits of $100,000.00." Based on these facts, reasonable minds could conclude Defendant made its determination without an adequate basis and should have investigated further if it had doubts regarding the severity of Plaintiff's injuries. Thus, whether Defendant had an adequate basis to conclude Plaintiff's damages amounted to only $100,000 rather than an amount more than triple that is a question of fact.

As Defendant and Plaintiff continued toward arbitration, Defendant acquired more information and made two settlement offers. Defendant made a $2,500.00 settlement offer on Oct. 25, 2022 (Doc. 67 at ¶ 12). Plaintiff had provided an initial disclosure statement asserting her "symptoms and treatment [were] ongoing" and providing her medical records. (Doc. 67-1 at 61). Medical records in Defendant's possession state Plaintiff had "transitioned into the chronic phase of recovery" and reference the need for future treatment. (Doc. 67-2 at 95). During the September 30, 2022 EUO, Plaintiff testified to her symptoms, ongoing treatment, and changes in her regular activities since the accident, stating she "had not returned to hiking or swimming," that did not have headaches or migraines prior to the accident, and that she continues to receive treatment with a neurologist. She described physical and mental fatigue preventing her from doing the things she used to do, pain that "still comes and goes as of the time of [the EUO]", treatment for anxiety and PTSD, and "cognitive struggles, memory issues, balance dizziness, fatigue, [and] severe migraines." (Doc. 67-2 at 102-03). Defendant questions Plaintiff's apparent failure to seek treatment for some time, but also notes in Plaintiff's EUO, she testified that she is still being treated by a neurologist. Defendant's records of Plaintiff's prior medical treatment, moreover, reflect financial concerns could have been a reason for delay or pause in treatment. Medical records from May 2021 state, "she is holding off on therapies until she figures out billing issues/concerns for past therapy sessions" and "she is going to pause vision and cognitive…while insurance pending auth." (Doc. 67-2 at 94-95). Defendant's records additionally confirm that Defendant had determined a supporting mechanism of

injury for the concussion existed. (Doc. 67-2 at 105). The record states:

> A [mechanism of injury] appears to exist for [Plaintiff's] head/ear striking the headrest so even a favorable biomech opinion that [Plaintiff] could not have struck steering wheel if restrained is **unlikely to do much for us**…the **impact [with] the headrest would be the supporting [mechanism of injury]** for the claimed concussion.

(*Id.*) (emphasis added). Thus, a reasonable jury could determine Defendant did not have a reasonable basis to challenge the validity of Plaintiff's claimed injuries.

When Defendant made its $20,000 settlement offer on February 17, 2023, Defendant had significant evidence supporting Plaintiff's claim available. Plaintiff had undergone an Independent Medical Examination ("IME") with Defendants' chosen examiner and provided her third supplemental disclosure statement. Based upon the IME, the examiner opined that Plaintiff had suffered a vestibular concussion and possible mild traumatic brain injury and indicated the need for future treatment but did not causally link her depression to the accident. Plaintiff's supplemental disclosure statement (Doc. 67-1 at 92) identified and provided the report of Lora White, an expert in life care plans. The report valued Plaintiff's future care at $280,784.00. (Doc. 67-1 at 95-106). Additionally, at the time of the February 2023 offer, Defendants' own records indicate their valuation of the injury was up to $135,651, that is $35,651 more than she had already been compensated. A jury could find the $2,500 and $20,000 settlement offers were intentional "lowball" offers. Whether it was 'fairly debatable' at this point that Plaintiff's damages totaled no more than $120,000 as indicated by the $20,000 settlement offer or the full $350,000 awarded at arbitration is a question most appropriate for a jury.

Defendant also received Dr. Block's supplemental report prior to arbitration, which stated Plaintiff's "[migraines aren't] going to further improve" and treating medications "should be continued indefinitely;" "a neuropsychological evaluation" "would be helpful in clarifying the nature and degree of her ongoing symptoms;" and "the changes resulting from the head trauma are, at this point, structurally irreversible. The brain itself will not heal further." (Doc. 67-1 at 88-89). Defendant, by proceeding to arbitration, maintained the

position that Plaintiff's damages, at most, did not exceed $120,000, the amount she had already been compensated plus Defendant's highest settlement offer. A jury could conclude the wide discrepancy between this position and the $350,000.00 arbitration award, $250,000 more than the compensation Plaintiff had already received, was unsupported by the evidence and reflects bad faith on Defendant's part.

Plaintiff has presented sufficient admissible evidence to create a genuine issue of material fact whether Defendant's handling of her claim was in bad faith. As such, summary judgment is inappropriate and the Motion will be denied.

Accordingly,

**IT IS ORDERED** the Motion for Summary Judgment (Doc. 66) is **DENIED**.

Dated this 9th day of February, 2026.

Honorable Roslyn O. Silver
Senior United States District Judge